## AFFIDAVIT IN SUPPORT OF MOTION TO COMPEL

I, Robert Rice, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed by the FBI for approximately six years and assigned to the Boston Division since June of 2004. I am currently assigned to the Violent Crimes Task Force ("Task Force"), which comprises personnel from the FBI, the Massachusetts State Police, the Boston, Somerville, Saugus, and Malden Police Departments, and the Middlesex County Sheriff's Department.

2. I am aware that Title 18 of the United States Code, Section 2113(a), makes it a crime for anyone to use force and violence, or intimidation, to take money belonging to or in the care, custody, control, management, or possession of any federally insured bank. I am also aware that Title 18 of the United States Code, Section 2113(d), makes it a crime for anyone to assault any person, or put in jeopardy the life of any person by the use of a dangerous weapon or device, while in violation of Title 18 of the United States Code, Section 2113(a).

3. I submit this affidavit in support of an application for an order compelling Craig Sparks, DOB xx/xx/1981 ("Sparks"), and Benjamin Michaud, DOB xx/xx/1977, each of whom has been charged by indictment with the armed bank robbery of the Bank of America branch located at 625 Moody Street, Waltham, Massachusetts, to provide samples of their DNA in the form of buccal swabs; complete fingerprints and handprints; and samples of their hair.

4. The facts stated herein are based on my personal involvement in this investigation, my review of police reports, and my discussions with other law enforcement officers involved in the investigation. In submitting this affidavit, I have not included each and every fact known to me about this investigation. Rather, I have submitted only those facts that I believe are sufficient

to establish probable cause to believe that the requested samples constitute evidence of the crime charged.

5.  On January 4, 2010, at approximately 12:24 p.m., two white males robbed the Bank of America ("Bank") located at 625 Moody Street, Waltham, Massachusetts. Both robbers entered the Bank wearing ski masks and dark-colored hooded sweatshirts and brandishing what appeared to be handguns. The robbers approached the victim tellers and demanded money. The robbers were provided with approximately $10,676.00 in United States currency, after which the robbers fled the Bank. A witness outside of the Bank observed the robbers enter a red sport utility vehicle bearing Massachusetts registration 4205YN and flee the area. At the time the Bank was insured by the Federal Deposit Insurance Corporation.

6.  On January 4, 2010, at approximately 12:15 p.m., FBI Special Agent Jason Costello and I initiated a surveillance on a black Chrysler Model 300 bearing Massachusetts registration 672AZ5 (the "Vehicle"), which was parked on the north side of Ash Street near the intersection of Ash Street and Crescent Street in Waltham, Massachusetts. The Vehicle is registered to Sparks's mother, Barbara Sparks, who has told investigators that, although the Vehicle is registered to her, Sparks is the person who uses it. The Vehicle had been located by means of a GPS device that previously was affixed to the undercarriage of the car at a time when it was on public property. Although nobody was in or near the Vehicle, the engine was running. The Vehicle was approximately two blocks away from the Bank, as Ash Street intersects Moody Street at approximately the 600 block of Moody Street. Additional members of the Task Force were moving into surveillance positions in the vicinity of Ash Street and Crescent Street at the same time surveillance was initiated on the Vehicle.

7.      Approximately five to ten minutes after surveillance was initiated on the Vehicle, Special Agent Costello and I observed a red Jeep Cherokee bearing Massachusetts registration 4205YN drive past our surveillance position on Ash Street at a high rate of speed and pull into a driveway across from the Vehicle. Two individuals wearing dark-colored, hooded sweatshirts got out of the red Jeep Cherokee, ran across the street, and entered and drove off in the Vehicle. One of the individuals was carrying a dark-colored bag. The red Jeep Cherokee proved to have a broken window, and its ignition had been "popped" such that the inner mechanism was exposed and the vehicle could be started with a screwdriver. Several minutes later the Task Force learned of the aforementioned bank robbery.

8.      Investigators attempted to follow the Vehicle but lost the visual surveillance shortly after it departed Ash Street. Visual surveillance of the Vehicle was reacquired on Interstate 95 North in the vicinity of Route 4 and Route 225 in Lexington, Massachusetts. Shortly thereafter, a marked unit from the Massachusetts State Police ("MSP") initiated a vehicle stop of the Vehicle. Special Agent Costello and I were directly behind the MSP unit as it initiated the traffic stop. As the Vehicle entered the breakdown lane, the driver of the Vehicle slammed on the brakes and drove the Vehicle into a ditch along Interstate 95 North. Two white male subjects exited the vehicle and fled into the woods along Interstate 95. Special Agent Costello pursued one of the suspects and a State Trooper the other, but the suspects evaded immediate capture. A number of state, local, and federal law enforcement officers joined the search.

9.      Sometime after 1:00 p.m., Detective Steve Garabedian of the Lexington Police Department stopped a car in which he had observed, in the front passenger seat, a white male

3

appearing to match the description of a white male seen running through yards after the time the two white males had evaded us. The white male, among other things, had cuts and abrasions consistent with those a person who had recently been fleeing through a wooded area might have. Among other things, Detective Garabedian requested that this male get out of the vehicle. This individual was identified as Michaud. On the floor of the car where Michaud had been sitting was a white plastic bag that proved to contain approximately $9,284 in United States currency with money bands from the Bank. Michaud was arrested and, among other things, a search of his person revealed that, in his pockets, he had two black ski masks, a baseball cap, and seven white latex gloves. Video surveillance footage from the Bank depicts the robbers wearing what appear to be white latex gloves. Michaud was wearing mismatched footwear – a sneaker and a shoe – at the time of his arrest.

10. The driver of the car was approximately 80 years of age. He told investigators, among other things, that Michaud had come to the back door of his home and asked to use the phone, saying he had been involved in an accident and did not want the police involved. On the floor of the driver's home, near the back door that Michaud had entered, investigators found a $1 bill. Based on the foregoing, there is probable cause to believe Michaud was one of the robbers.

11. In the woods in the area where the two individuals had fled, investigators found a total of $1,381 in United States currency. In the same vicinity investigators also found a backpack containing clothing, including two hooded sweatshirts. The backpack also contained, among other things, sweatpants that had $2 in United States currency in one of the pockets. An additional $1 bill was found near the location along Interstate 95 North where the Vehicle was abandoned.

12. During a safety sweep of the Vehicle, Special Agent Rachael Boisselle observed items that appeared to be two handguns on the floor of the front passenger seat. These items were seized for safety purposes and identified as B-B guns. They are consistent in appearance with the weapons used in the robbery of the Bank. The Vehicle, which had been abandoned in the ditch along Interstate 95 North, was towed to the FBI garage in Wilmington, Massachusetts. The Vehicle was searched pursuant to a warrant on January 19, 2010. Investigators found, among other things, a pair of black high-top sneakers that are consistent in appearance with the footwear worn by one of the robbers; a pair of white sneakers consistent in appearance with the footwear worn by the other robber; the "mates" for the sneaker and the shoe that Michaud was wearing when arrested; a cell phone with the battery removed; a knife; a dagger; two white latex gloves, turned inside-out, as if someone had been wearing them and had removed them; Michaud's Department of Correction identification card; and a screwdriver.

13. In the rear of Vehicle investigators also found, among other things, a brown jacket. Investigators found a wallet in the jacket that appears to belong to Craig Sparks. Specifically, although the wallet contains a Massachusetts driver's license for Sparks's girlfriend and a photographic identification card for a male other than Sparks, most of the other identifying materials in the wallet bear Sparks's name, including his Massachusetts driver's license; his Massachusetts learner's permit; his expired Massachusetts driver's license; his Social Security account number card; his Sovereign Bank card; and his MassHealth card. In addition, the wallet contains receipts for several MoneyGrams, including a receipt for a $65 MoneyGram that was obtained on January 4, 2010, the day of the robbery. The receipt bears the handwritten notation, "Probation." Investigators have spoken to the state Probation Office in Worcester and have

learned, among other things, that Sparks, who is on probation, had an appointment there the morning of January 4, 2010; that he arrived at approximately 9:21 a.m.; that he left at approximately 9:45 a.m.; that he was wearing a brown jacket; and that, while there, he did provide payment to the Probation Office in the amount of $65. A Probation Officer has looked at a photograph of the brown jacket seized from the Vehicle and indicated it is consistent in appearance with the jacket Sparks was wearing the day of the robbery. Given the inherent unlikelihood that somebody would intentionally leave his wallet behind in a car, it is likely that Sparks was the second robber and that he did not leave behind his jacket and wallet by choice but rather abandoned the jacket and wallet when he and Michaud fled from the Vehicle.

14. Investigators also have examined information from the GPS device that was affixed to the Vehicle. The GPS information indicates, among other things, that the Vehicle left the area near Sparks's Worcester apartment the morning of January 4, 2010; that it was in the vicinity of the Worcester Probation Office at the time of Sparks's appointment; that the Vehicle then traveled to Charlestown, Massachusetts, and moved around to various locations in Charlestown for approximately 30 minutes; and that the Vehicle then traveled to Waltham, ending up at the location where we encountered it and began our surveillance at around 12:15 p.m. The red Jeep Cherokee that we saw the robbers abandon a short while later proved to have been stolen in Charlestown. The screwdriver that was found during the search of the Vehicle is a tool that could have been used to "pop" the ignition and start the Jeep Cherokee.

15. We have learned from Sparks's biological father that his other children have told him that a person named "Benny" had been living with Sparks in Sparks's Worcester apartment in the weeks immediately preceding the robbery. I spoke yesterday with Sparks's

6

mother, Barbara Sparks. Among other things I showed her a picture of Michaud and asked her to tell me who the photograph depicts. Ms. Sparks indicated that she recognized the person as a man she had met through Sparks named Benjamin. Sparks and Michaud thus have a relationship that predated the robbery.

16. The parents of Sparks's girlfriend have received telephone calls from her since the day of the robbery. Sparks's girlfriend told her mother on January 14, 2010, among other things, that Sparks had gotten himself into some trouble and that she and Sparks were going away for awhile. Sparks's girlfriend claimed they were in Mississippi. Sparks's girlfriend also called and spoke to her mother on January 17, 2010, telling her mother, among other things, that she and Sparks were fine and that she (the girlfriend) could not leave because she knew too much.

17. We learned from the Worcester Probation Office that Sparks missed an appointment there on January 20, 2010.

18. On February 5, 2010, we located and arrested Sparks at a location in Hampden, Maine, a community located near Bangor, Maine. His girlfriend, Ryanne Burton, was at this location as well. She spoke to Special Agents Eric Toole and Rachel Boisselle. In summary and among other things, Burton told the agents that Sparks gave her about $3,000 in cash the morning of the robbery, January 4, 2010. Sparks told her that "they were going to see some men about some horses." Burton did not know what precisely Sparks meant by this comment but that she believed it meant he was going to do something illegal, as he had made this same statement on other occasions on which he had later returned with money. Burton said that Sparks told her to go to his mother's house in Worcester for the day. Burton said that, at about 3:30 p.m. the day

of the robbery, Sparks called her and said that he and "Benny" (an obvious reference to Michaud) were in trouble and that he needed Burton to come to Charlestown to pick him up. Burton said that she used Sparks's mother's car to go to Charlestown and pick up Sparks at the home of a friend on West School Street. As they were driving back to Sparks's mother's home to drop off the car, Sparks told Burton, in substance, that "The Feds think we did a robbery." Burton became extremely concerned that by "we" Sparks meant him and Burton, but Sparks told her that instead he meant Sparks and "Benny." Burton and Sparks spent the night at the home of a friend of Sparks in the Worcester area. The next day they retrieved Burton's car from a mechanic and drove to Maine, where they stayed at the location in Hampden, Maine where Sparks ultimately was arrested. Burton indicated that the only time between January 5 and the Sparks arrest that they returned to the Massachusetts area was over the weekend of January 16 and 17, 2010, so that they could see a man who was due to return to prison the following Monday.

19. There is probable cause to believe that Sparks used a red Volvo sports utility vehicle bearing Massachusetts registration 75XX90 (the "Volvo") to flee from Lexington. Specifically, at approximately 2:03 p.m. on January 4, 2010, the Lexington police responded to a report from a Lexington resident of a potential breaking and entering in progress. The Lexington police learned, in substance and among other things, that the resident had been on the second floor of his home when he heard a loud crash. He thought his cats had knocked something over and went downstairs and into the kitchen. The resident saw that his side entry door had been pushed open. He saw a puddle of water and some snow on the kitchen floor. He called 911 and was instructed to leave the residence. After the police responded the resident realized that his vehicle, the Volvo, was missing from the driveway. I later spoke to the resident myself and

8

learned, in substance and among other things, that his car keys had been in a pocket of his leather jacket, which had been hanging on his bannister, and that the keys were now missing.

20. The Volvo turned up a short while later in Somerville. Specifically, the Somerville authorities ticketed the Volvo for parking in a permit-only parking area at approximately 2:44 p.m. that afternoon. Somerville Police Detective John Oliveira, who is assigned to the Task Force, is familiar with Somerville and Charlestown and has told me that the location in Somerville where the Volvo was left is about a 20-minute walk, or a 5-minute car ride, from the location on West School Street in Charlestown at which Burton said she picked Sparks up that afternoon.

21. The Volvo was later processed for fingerprints and fifteen latent print lifts were taken.

22. I have spoken with laboratory personnel from the nuclear DNA unit of the FBI. Through that conversation and through my training and experience with the Task Force, I know that a number of the items recovered are potential sources of DNA evidence, including but not limited to the ski masks recovered from Michaud, which are consistent with the masks used in the robbery; the latex gloves recovered from Michaud and the inside-out pair recovered from the Vehicle, which are consistent with the gloves worn by the robbers; the hooded sweatshirts and the backpack recovered in the woods; and a number of the other items recovered. I have spoken with an examiner in the FBI latent print operations unit, who has reviewed the latent print lifts from the Volvo and has told me that at least some of them are prints of finger tips, which are not captured on fingerprint cards taken during the arrest process. I know from my experience and training that a number of items recovered in this case are further potential sources of prints, such

as the B-B guns, the latex gloves, the cash, and a number of other items. I further know that, like the fingertip prints from the Volvo, latent prints recovered on other items are often from areas of the fingers, or from the palms of the hands, that are not captured on fingerprint cards taken during the arrest process. Finally, I know from my experience and training that a number of the items recovered are potential sources of human hair evidence, including the baseball cap and ski masks recovered from Michaud; the hooded sweatshirts and other clothing recovered from the Backpack in the woods; and a number of other items.

23. Accordingly, in sum, there is probable cause to believe that a number of items recovered are potential sources of DNA evidence, fingerprint and palm print evidence, and human hair evidence; there is probable cause to believe that Sparks and Michaud are the robbers; and there is therefore probable cause to believe that samples of the DNA of Sparks and Michaud in the form of buccal swabs, Sparks's and Michaud's full finger and palm prints, and samples of Sparks's and Michauds hair constitute evidence of the armed robbery offense with which they are charged.

Signed under the pains and penalties of perjury this 31st day of March, 2010.

ROBERT RICE
Special Agent, FBI