# AFFIDAVIT

I, Robert Rice, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed by the FBI for approximately six years and assigned to the Boston Division since June of 2004. I am currently assigned to the Violent Crimes Task Force ("Task Force"), which comprises personnel from the FBI, the Massachusetts State Police, the Boston, Somerville, Saugus, and Malden Police Departments, and the Middlesex County Sheriff's Department.

2. Without setting forth all information known to me regarding these incidents,[1] I am aware that, as of December 24, 2009, the defendant in this case, Craig Sparks ("Sparks"), was a suspect in several recent armed robberies, including at least the armed robbery of a pharmacy in Fall River, Massachusetts in September 2009, the armed robbery of a bank in Milton, Massachusetts, in October 2009, and the armed robbery of a pharmacy in Shrewsbury, Massachusetts in November 2009. I am also aware that law enforcement authorities believed Sparks was going to commit further robberies in the future. I am further aware that law enforcement officers had seen Sparks driving a black Chrysler Model 300 bearing Massachusetts registration 672AZ5 (the "Vehicle") registered to his mother. It was due to information that Sparks was committing armed robberies that a GPS device was placed on the Vehicle.

2. A GPS device initially was placed on the Vehicle at some point between 2:00 a.m. and 4:00 a.m. on December 24, 2009. The device was battery-operated and drew no power from the Vehicle. It was placed on the exterior of the Vehicle. At some point thereafter the

---

[1]Among other things, I specifically do not want to disclose information that may have been received from confidential informants ("CIs") upon assurances that their identities would not be made known. Such information can be so singular in nature that, even if a CI's identity is not explicitly made known, the identity might nonetheless be determined based on the nature of the information and the limited number of people that would have been privy to it.

battery supply failed.  Accordingly, on December 28, 2009, again between 2:00 a.m. and 4:00 a.m., the GPS device was removed, the battery supply was replaced, and the GPS device was then placed back on the exterior of the Vehicle.

      3.      The GPS device was able both to provide information as to its location in "real time" and to record its location as the Vehicle to which it was attached moved from place to place.  It did so by communicating with satellites to get a "fix" on its position.  The GPS device then communicated through a wireless connection with a service provider.  An FBI agent could log onto a website and obtain information as to the location of the GPS device when the Vehicle was moving.  The Vehicle would be depicted on the computer screen as a dot on a map that moved as the Vehicle moved.  If the Vehicle came to a stop and the engine was turned off, the device would "go to sleep" within five to ten minutes and cease to communicate with satellites and provide location information.  If the Vehicle came to a stop but remained idling, it is possible that the device would "go to sleep" within five to ten minutes but it is also possible that the engine vibrations would cause the device to remain activated.  If the Vehicle started to move, the GPS device would once again activate and start providing information, and the agents working on the case would receive an e-mail message informing them of this fact.  If the GPS device was "asleep" and the Vehicle therefore was not moving, the agents working on the case could do nothing to determine where it was, although if the Vehicle appeared to be stationary for an unusually long period of time a technician could send a signal for diagnostic purposes to determine whether the Vehicle truly was remaining stationary or whether instead the power source had failed.  During periods in which the Vehicle was moving but agents were not monitoring the location of the GPS in "real time," the location data nonetheless was saved and could be accessed at a later time.

4. I was not involved in the investigation at the time the GPS device was placed on the Vehicle. My understanding until recently was that the device was placed on the Vehicle when it was parked on a public way. I have learned that on both occasions that the GPS device was affixed to the exterior of the Vehicle, it was parked in front of 15 Trottier Street, Worcester, Massachusetts. I have now learned that Trottier Street is actually one of many private streets located in Worcester. I have visited Trottier Street and seen that it is essentially a dead-end street. Beneath the name of the street on the street sign at the beginning of the street, the words ""Private Street Dangerous" appear. As one proceeds down the street there is an entrance to a business to the right, which also can be accessed from the main street. There are several residences to the right as on continues down Trottier Street. On the left there are two residential buildings: 11 Trottier Street and 15 Trottier Street. Both are multi-unit dwellings. Affixed to the side of 11 Trottier Street underneath a stairway is a sign that reads, "Private Property No Trespass." 15 Trottier Street is to the left beyond 11 Trottier Street. There is a fence beyond it near some dumpsters that has the same sign. When I was there I observed cars parked in the area near 15 Trottier Street.

5. I have spoken to the landlord of 11 Trottier Street and 15 Trottier Street. He told me that Sparks rented apartments in 15 Trottier Street but has no ownership interest in the property. He told me that Sparks lived in 15 Trottier Street for about one year, initially living on the middle floor on the left-hand side and then moving to the upper floor on the right-hand side. The landlord told me that the City of Worcester (the "City") plows Trottier Street in the winter and also has graded the street a number of times. In order to have the street paved, however, the owners of the property would have to petition the City and then pay themselves to have it done. The City does provide water and sewer service to 15 Trottier Street and the other residences, and

in fact put in a new water line this past summer. The tenants of 11 Trottier Street and 15 Trottier Street park in the area between the buildings. The landlord recalled Sparks parking in front of 15 Trottier Street when he lived there.

Signed under the pains and penalties of perjury this 16th day of September, 2010

/s/Robert Rice
Robert Rice
Special Agent, FBI